Your honors, may it please the court. My name is Ethan Ballow and this morning I speak for Kelechi Ajoku. I'm going to watch my own clock. I'm going to do my best to reserve three minutes for rebuttal. With the time we have this morning, I'm going to try to address the sufficiency of the evidence arguments to begin with, and then with as much time as we have remaining, I will work through the jury instruction challenges depending on the questions I get from the court. Of course, I'm prepared to answer any questions you have on any of the claims we've raised. Beginning with the sufficiency of the evidence, Mr. Ajoku contends with respect to count one, with respect to all counts, that there was insufficient evidence. All four counts charge false statements under 1035. But I'd like to break it up today as much as how they were pled by the government in the second superseding indictment, which is count one has five statements that were either made directly by Mr. Ajoku or forwarded by others to the California Department of Health. Count one had additional three statements Mr. Ajoku allegedly made to federal investigators, and then counts two through four, which allege substantially identical allegations of falsely certifying records, which were then, which were, according to the government, required to be maintained for Medicare purposes. So let's start with count one and the California statements, as I'll refer to them. And whether these statements were made directly by Mr. Ajoku to the Department of Health or forwarded by others, we contend and appeal that none could be found to have violated 1035, no rational juror could make that determination, because none involved, none were in a matter involving a health care benefit program. And to help sort of identify sort of where we are, it's important to recognize what the government said in their summation on this point. What the government was arguing to the jury. Is this a question of first impression in our circuit, whether that, whether his statements, his false statements made to California authorities can satisfy this standard because they somehow facilitated Medicare fraud? Absolutely, Ron. This is an issue of first impression. Actually, I believe all of the, the 1035, even the jury instruction issues are all first impression issues. Apart from the duty to disclose under the Fifth Amendment has addressed that, excuse me, except the willfulness challenge for 1035, even the instructional challenges for materiality, for willfulness and duty to disclose are first impression in this circuit. The question is, what the government argued to the jury was, based on the instructions they obtained, was the government does not have to prove that the defendant, that the fact cover-up involved Medicare or the fact cover-up influenced Medicare. This is ER 109 and the government's incorrect. The statute is plain. Element of the offense is the statements have to involve a health care benefit program. And the government's essentially arguing materiality, that there was downstream reliance or potential reliance by Medicare. But that's not the challenge I'm making right now. There's an independent element of 1035 that says the statement itself has to involve a health care benefit program. And the first five statements that are alleged in count one are statements on, about California regulations, regulatory compliance to become an exemptee. And these California regulations apply for all HFDRs, home medical device retailers, regardless of whether they subsequently decide to sell prescription devices, regardless of whether they actually bill people through Medicare. If you're in California and you want to sell canes at your Walgreens, without regard to anything else, you need this license. It's a state regulation. So none of these statements, we contend, involve. And we've cited to the court a Third Circuit case, a Balanasi. We've cited the Second Circuit case, Awan, and how the court should define involved. And involved, it's really not rocket science. Everyone has a sense of what involved means. If something's involved something, it's a necessary accompaniment. It has to follow. That's what involved means. In this case, none of those statements to California, we contend as a matter of law, can meet the standards. So those statements should not have been permitted, and they cannot support conviction. To move forward, there's been three statements to the federal government. And we conceded in our brief, and the government's on much stronger ground here when they say, when the federal investigators for Medicare came around, and Mr. Kelechi Ojukwu spoke with them, they alleged three false statements. And let's go through those, because we think there's insufficient evidence on those three. There were three. One, they claimed that Mr. Ojukwu said that Santos always delivered real nutrition, which I will now refer to colloquially as milk, because I can't pronounce it well, with syringes. The second alleged false statement was that he personally instructed patients regarding how to use syringes. And the third claim was that he personally instructed patients on how to use feeding tubes for the milk. With respect to the first one, and I direct the court to 433 to 443 of the ER to stipulate an accurate transcript of the actual recordings. They were surreptitiously recorded, as is often the case with federal investigators. So there is no doubt about what Mr. Ojukwu said. Because you can listen to it on the tape, which is in the record. You can read the transcript, which we provided you. And at the end of our opening brief, we even included as an appendix, for easy reference, those transcripts, so you can know what did Mr. Ojukwu say to these federal investigators. With respect to the first claim of falsity, a false statement, the government says he said that Santos always delivered milk with syringes. And that was false, because Santos did not do that. And we agree, it's a false statement. But it wasn't knowingly false, because the undisputed evidence, the undisputed evidence which caused the government to withdraw and abandon the fraud charges against Mr. Ojukwu, charges they had prevailed upon with every other dependent at Santos, was that Mr. Ojukwu was a dupe. And he did not know that Santos was committing Medicare fraud. Jose Gonzalez testified, Palma, the other cooperator, the other leader, did not testify. But Jose Gonzalez testified for the government as a cooperator, and said he kept Mr. Ojukwu, they kept Mr. Ojukwu in the dark. They referred to their Medicare fraud as, quote, confidential business information, which was none of Mr. Ojukwu's business. So he did not know. They told him that they were delivering syringes. Mr. Ojukwu believed and understood that Santos was actually delivering motorized wheelchairs, that they were actually delivering milk with syringes, that they were actually delivering milk with feeding tubes. He had no knowledge of the undercells, he had no knowledge of the replacement of motor scooters, he had no knowledge of any of the fraud. So when he told the federal investigators, and they asked him, do you always deliver syringes to Santos? And he says, yes, to my knowledge that's true. That can't be a knowingly false statement on this record. Because there's no evidence in this record that Mr. Ojukwu believed that to be false, that he knew it to be false. And that's the standard. The government has to prove beyond a reasonable doubt that he knew it to be false, and he didn't. And there's not any evidence in the record, Jose Gonzalez's testimonies to the contrary, that he didn't know. I understand that your client was an exemptee, is that the right phrase? That is the right phrase, Your Honor. And the presence of an exemptee was required, at least under California regulatory authority, to do what the Santos group was doing, correct? Absolutely, Your Honor. And he knew he was sort of a straw person, right? He was told that he was- He was paid for doing nothing. I wouldn't completely agree with that, Your Honor. I think you could say he was paid for doing little, and he was definitely paid not to ultimately fulfill all the roles of the exemptee. He was never properly instructed. And he knew all of that when he answered these questions about, do you always do A, do you always do B, right? Yes. I think he was aware at the time that when he was hired, he was told it was a technicality. They needed him on staff, and these would be his responsibilities, and that's how he would fulfill them. He was never told, these are the actual responsibilities you require by statute. If you don't fulfill them, we're in violation of statute. He was never told that, so I would take issue with that, Your Honor. But we're going to talk about duty of disclosure, if I may, in a bit. I don't think, with all due respect, Judge Hawkins, that that disclosure obligation can change the accuracy of what he told the federal agents into false statements. And under Bronston, literally truthful statements may not be prosecuted as false statements, and that's Supreme Court authority. Thomas, the most recent case from this Court, upheld that very standard, that literal truth. If you speak the literal truth, that cannot be a false statement. I think this Court right now will consider in bonds whether or not a literally truthful statement can become a predicate for obstruction of justice under 1503. But it's plain in this circuit that a literally truthful statement can never be supporting a false statement conviction. In your allegation, your claim is that what he told the investigators was, as far as he knew, absolutely true. Right, that he had, yeah, that he did not know they did not deliver syringes. And Gonzales' testimony confirms he did not know they didn't deliver syringes. So it can't be knowingly false, much less willfully false, because he didn't know that to be false. And the other two statements that he makes to the federal agents, or alleged to have made, the counts of, and it's like subsection F of count one in the trial indictment, and it's whatever count in the superseding indictment. The second two counts, they allege that he personally told the federal investigators that he delivered syringes and feeding tubes, and he personally instructed patients. And that's just false. And again, I direct your honors to 433 to 443 of the excerpts of record. He never said that. And you can read what he said. He, when he shows up, they're already having an interview of Palma and Duarte and Jose Gonzales. They've called in Mr. Ojukwu. He's on his way from his other job at Country Villa Healthcare. And when he arrives, he arrives to Mr. Gonzales saying, that's my man here. And the agent says, oh, you must be Kelechi Ojukwu. Hello, I am so-and-so investigator. And that's right, that's 433. And the interview goes on from there. And they say, so you're the ones who deliver the syringes. And he goes, no, others do the deliveries. That is the opposite of saying I personally deliver syringes. About the feeding tubes, you look at the context. He's referring, when they refer to Santos as you, he refers to we and us as the corporate entity of what they do. But again, none of this is knowingly false because he was told by Gonzales that they do in fact make correct deliveries. So they can't prevail on count one in any case. And so count one should fall away under a sufficiency standard. On counts two to four, the government has alleged pretty much the identical false statements. They have three patient certifications. And they say what the grand jury alleged was what was false is that Santos actually delivered motorized wheelchairs. When in truth, they did not. When in truth, Santos, Jose Gonzales, and PAMA delivered much less expensive motor scooters. And this was part of their Medicare fraud. But Mr. Ajuku was told by Mr. Gonzales that they did do these deliveries. That each of these three people receives wheelchairs. And he asked Mr. Ajuku to sign on the paperwork that indicated that. But again, on appeal, the government's saying, well, it's a different false statement. On appeal, the government's urging Your Honors to affirm because, excuse me, because on the certifications, he signed the certifications that he didn't do the deliveries. He's saying that's false. And that may well be true. But that's not what was alleged by the grand jury. And that's not what the government was required to prove in this case beyond a reasonable doubt. They're stuck with the allegations they made. And the truth of the matter is, when they abandoned the fraud case, they didn't look closely at the indictment. They didn't look at what they had learned from the cooperators. They didn't reevaluate their case. They went with a portion of the case they had brought. But those statements that he made were not knowingly false as well because the undisputed evidence is he was told that these people did receive motorized wheelchairs and were instructed on their use. So he could not be found beyond a reasonable doubt to have known them to be false, which is an element, because he didn't know that, because the other cooperating co-defendants told him something opposite, and he believed what they said was true. And that's undisputed in the record. I was just going to say that. Thank you, Judge Wardlaw. I'll take the last two minutes for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Aaron May on behalf of the United States. This was not a closed trial. After nearly seven days of testimony, the jury came back with guilty verdicts on all counts in under four hours, and they did so largely on the basis of two key witnesses. The first was the defendant himself, who on cross-examination admitted to knowingly and intentionally making numerous false statements, to signing a false affidavit, to signing a false employment contract and backdating it, to signing false Medicare patient training certificates, and to signing false hour logs. In addition, there was the testimony of Jose Gonzalez, who was a co-schemer of the defendants, who pled guilty, served his jail sentence, and then without any cooperation deal or anything, came forward and testified, which he said was because while in prison he found God, and testified that he and the defendant came forward with a scheme to obtain an exempt deed so that they can bill Medicare, and that they went out and they wanted somebody who would be a front so they can show to Medicare that look, we're billing, I'm sorry, that we are complying with state laws for exempt deeds, and that we just need you to sign some false documents, and then when state and Medicare inspectors come to show up and tell them that you're doing the job of the exempt deed, and the evidence at trial showed that that scheme was executed. And defendant on appeal tries to frame the case differently. It's a count one as a false statement case, and it wasn't tried as a false statement case. It was tried as a trick, scheme, or device to falsify, conceal, or cover up a material fact. And as such, as this Court held in United States v. Woods, the government doesn't have to prove any false statements. All it has to prove is that there was a scheme, trick, or device. And the instruction said that would require there to be an intent to defraud and a course of action. And defendant tries to make this false dichotomy here on appeal about the California statements and the Federal statements, but that's not the way the case was charged or tried. It was all part of a scheme to defraud Medicare into believing that the defendant was doing the duties of an exempt deed, which Medicare required in order to make any claims to Medicare. You had to comply with state laws. Medicare's requirement number one is that you must comply with all Federal, state, and local laws. And so if you don't comply with the state laws, including the exempt deed laws, you can't bill Medicare. And that was explicit testimony on this. It's undisputed. So let me get back to this word involved, because defendant, in his reply brief, makes much about it. The word involved is the same word that this Court uses to describe jurisdiction under 1001. In United States v. Green and United States v. Orrin, when the Court is explaining what the jurisdictional element is of 1001, it says that it must involve the Federal agency at the time. So it actually, this Court actually uses the word involved when it's describing jurisdiction. Second, if you go to the dictionary, and I went to the one that the government hands me when I signed up, and pulled up the dictionary definition for involved, there are eight different definitions. The defendant chose the one that was most favorable to his cause, and I understand that. But I think the one that's most appropriate is to relate to or affect. And when you're talking about a jurisdictional element, and you're talking about whether something involves Medicare, that's what it means. Does it relate to or affect Medicare? And that's the appropriate definition. And that's the same way this Court treats the jurisdictional element of 1001 as set forth in Green and Orrin. So now if we want to get to the falsity of the actual statements, defendant concedes in his reply brief at page 3 and footnote 3 that the statements made to the Federal agents were material and involved Medicare. But you can't parse out the scheme into, well, this part talked to the Federal agents and this part didn't. It was one scheme. And by conceding that it was material and involved Medicare, he's conceded that the whole scheme involved Medicare. So I think on appeal, that issue is resolved. But if we were going to get to the particular false statements that defendant was talking about, they, even if we did have to prove a scheme, I mean, sorry, didn't have to prove a scheme and had to prove particular false statements, they were, in fact, false. When defendant first comes in to the interview, he's, the agents are talking to Jose Gonzalez and they say, are you the, who handles all the syringes and whatnot? And they say, this is my man here. And so they turn to the defendant and say, so you're the only one that's, they ask him what he does, basically. And he volunteers and says that he's the one in charge of how its syringes are distributed and how it works. And that's at Government Excerpt of Records 948. He's the one that volunteers, that he's the one in charge of the distribution and how it works. The agent testified at Government Excerpt of Records 105, that defendant said he was responsible for opening up the cabinet and dispensing the syringes and giving instructions to patients on how to use it. And the agent also was asking the question, he said, do you go through with the patients on how to use the feeding tubes? And in response, defendant says, yeah. And that's at Government Excerpt of Records 147 and 148. So to the extent the government, if the government had the burden of proving particular false statements, there was sufficient evidence of those false statements. And I'd like to take a moment to distinguish the case cited in the reply brief, United States v. Adamson, which talks about a scheme in the situation where the government did have to prove false statements. And that's because under the Wire Fraud statute, as was the case in Adam, that was charged in Adamson, there are two types of schemes. A scheme to defraud and a scheme to obtain money and property by false representations or false promises. In Adamson, it was a second type of scheme, a scheme involving false promises and representations. What was the evidence at trial that Ajoko knew when he went through and got all these exemptee paperwork and licenses, that he knew this was involving a federal health operation? I'll answer that question about the evidence, and then I want to follow up with something, too. Okay. When he was interviewed by Mr. Gonzalez, Mr. Gonzalez testified that he said part of the job is showing up when State or Medicare inspectors come and answering their questions to make it look like it's going to work. What's the citation for that? I don't have it readily handy, Your Honor. It was in Mr. Gonzalez's testimony. I believe he testified on February 17th. And I believe it's cited, too, in my brief. I can get that. But let me back up, which is because Your Honor is picking up on a theme that was raised in the reply brief, which is actually a red herring. The Supreme Court and this Court has held that there has to be no knowledge of the jurisdictional element. So in United States v. Yerminian, which is a Supreme Court case and has been followed by this case, and I believe in Oren and other cases, the question was, did the defendant have to know that the false statement was being directed to a Federal agency? And the Supreme Court in Yerminian said no, that there is no knowledge requirement that the statement must affect a Federal government agency. You're talking about 1030, the Court's interpretation of 1035? About 1001, which has the same exact language as 1035 in terms of what is being criminalized. It's just the jurisdictional element has changed. For 1001, it must affect a government agency, and for 1035, it must involve a health care benefit program. But he was convicted under 1035. Correct. But I would argue that the case law for 1001 on the knowledge requirement of the jurisdiction is relevant, if not binding, here where the same exact type of language is used. So he doesn't have to know that the matter involves a health care benefit program? Correct. And if even looking at the charging language of the statute, it's whoever in a matter involving a health care benefit program, and then it prescribes certain conduct. And I believe one of them is knowingly and willfully makes false statements or knowingly and willfully engages in a scheme, trick, or device. So the knowing and willfully doesn't modify. It modifies. Your argument is it modifies the trick, scheme, or device, or makes a materially false statement. Correct. And I would direct the Court to your decision in your minion, because it actually provides a very thorough background of how 1001 came into being and how, going to the willfulness argument, how the specific intent requirement of knowing more than the being knowing and deliberate came about. And in your minion, it goes through the congressional history. First, the predecessor to 1001 specifically required an intent to deceive the United States. That was the predecessor to 1001. There's some Supreme Court rulings on that. Congress didn't like it. And so they amended 1001 to eliminate the requirement that there be an intent to deceive the United States. This was around the New Deal era, where there's a bunch of new Federal programs. And they wanted to make sure that if anyone's knowingly and willfully, knowingly and deliberately lying and it affects the Federal Government, that there's some criminal penalties for that. And they ask, and they say specifically in your minion, and this Court has followed that, that you don't have to know that it affects the Federal Government. And the United States v. King case is pretty clear on this. This is a case from, I believe, 2012 in this circuit, where the defendant made false statements to an Idaho agricultural inspector about what was being pumped into wells. He lied to the inspector, and he was charged with 1001, even though he was a state inspector. And they said, look, this was involved a crime of Clean Water Act, Safe Drinking Water Act violation. That's enough to meet the jurisdictional requirement. What's the evidence that Joku knew fundamentally what the DeSantos group was up to? At trial, we argue that he didn't know the whole scope of the fraud, that he knew that he was the front and that he was supposed to lie to the state and to Medicare, but that he wasn't fully involved in the comings and goings of all the billing aspect. And that was clear. We never argued that he was. So he didn't know, for example, that the Santos group was telling the government for reimbursement purposes that it was providing wheelchairs to needy people who needed wheelchairs, but in fact providing them with what? Motor scooters. Little scooter-type things, which were much different than sophisticated wheelchairs. Correct. Correct. We didn't argue that he knew that. But if we're getting to Counts 2 through 4, which I think the Court's direction is, these were Medicare patient training certificates. These are forms that Medicare requires for proof of training and delivery. And defendants signed these and backdated them, and he signed them as if he was the person that was doing the deliveries and training. So he has knowledge that he knew. Did he admit to that in Cross? Correct. He admitted that he knew he didn't do the training, and he admitted that he was signing as the technician who did the training. And this is at Exhibit 75 are all these certificates. And he's handwriting in there, oh, beneficiary, which is the fancy word for Medicare patient, beneficiary adequately trained on the wheelchair and things of that nature that made it look like he was the person that was doing this. When he was never, he never did, he admitted he never did any trainings, and he admitted on Cross that he knew he didn't train these people. And further, on Counts 2 through 4, a willful blindness instruction was given, and that's at Government Excerpt of Records 1052. So certainly given all of his experience with this company where he's a no-show employee who's hired explicitly to fool the regulators, that is a high probability that if he's signing documents like the other documents he signed that they're false and that he knew or should have known what he was signing wasn't true, especially when he's signing that document as the person that was training it. And, again, on Counts 2 through 4, there's two theories presented. One was a false statement theory, and one was making and using false documents. And the indictment clearly alleges the particular false documents that were used. There's no variance. It's not we didn't pull some switcheroo and say there was some different false documents. We identified the false documents, proved out that they were false, and he admitted the time he signed them that he knew that he hadn't trained these people. So I don't think there's much question there. I also want to clear up one other thing that was brought up in argument. The defendant argues that the defendant denied making deliveries. And that's not what the record says. The agent asked him, so are you the only one that makes deliveries? And he said, no, I'm not the only one. And then he goes on and he's asked a bunch of questions about what happens on deliveries. And he says things to the nature of, like, he asked about the identification. If they have problems on deliveries, what do they do? We call back to the office. You know, he says, he's asked whether you go through with the patient on how to use the feeding tube. And in response, he says, yeah. So there's sufficient evidence for the jury to conclude on that one particular false statement that when he said he trained patients, that he knowingly lied about that statement. And for all these reasons and the reasons set forth in the brief, the government believes the convictions on all counts should be affirmed. Thank you, counsel. I will try to work through my few points quickly in response. One, the government opens up by telling the Court this was not a false statement  This is the opening of Mr. May's opening statement. You can find it at clerk's record, docket number, District Court 430, page 83 of the trial transcript. Defendant has been charged in his own trial for four counts of making false statements in connection with health care matters. That's Mr. May. Why? Because that's what he was charged with. Now, all you have to do is look at the indictment itself. And on the page of the trial indictment, it starts at page 117 of the ERs. And they allege, quote, in particular, all of the false statements. And they set forth how the indictment works, what did he say, and then an allegation that the truth was the opposite of what he said. This was a false statement case. It is true that it morphed into a concealed case. And in closing arguments, the government argued what they told you now, that the concealment was that even though he signed up as the exemptee, he didn't perform the duties. And he should have disclosed that. He concealed that. That's what they argued to the jury. I agree with that. Please look at the indictment, pages 117 to 123 of the ER. You can't find those allegations by the grand jury because the grand jury didn't bring that case. The grand jury didn't make that allegation. And yes, he was convicted of that, and that's what we're complaining about. One of the things we talked about and why that is inappropriate is because there's a duty to disclose. If you're going to have a concealment under 1035, you have to have a duty to disclose. That instruction wasn't given. In the 1001 context, this circuit and eight others and two Supreme Court justices, being Kennedy and Scalia, all say beyond doubt to have concealment liability under 1001, you have to show first a duty to disclose. And that's consistent with Fifth Amendment jurisprudence because you can start talking and you can stop whenever you want. You can tell the literal truth. The questioner has obligations to ask you questions. So to convict someone of concealing, it's only when they have a duty. That instruction wasn't given. That's an independent ground for at least reversal in the trial. The government regarding counts two through four says, correctly, the forms make it appear as if Mr. Ajupu signed them. But again, I urge the court to look at pages 122. That's not the falsity alleged. What the falsity alleged for all counts in our court is that the recipient, all the same, falsely representing that recipient was supplied and trained on a motorized wheelchair. What was alleged was the falsity of the delivery, not who signed the form. And so that's a different claim. And on the claim that grand jury brought, did Mr. Ajupu falsely, knowingly and willfully, tell the government that person X was supplied a motorized wheelchair when they weren't? He didn't know that to be false. And they're stuck under Jeffers, under Tajimi, under a whole slew of circuit precedent, Supreme Court precedent. They got to prove the charges they brought. And, yeah, they proved something else. But they can't stick Mr. Ajupu with this conviction because they proved something else at trial. They chose to make specific allegations of falsity, and they didn't prove them beyond a reasonable doubt. And because of that, he's entitled to a judgment of acquittal. The last quick point I'll make is when they talk about involved in this, as Judge Wardle pointed out, this issue of first impression. We have some clerks with us today. Some of them may be barred in the state of California, which means they've passed their MCLE requirements. And it's material when a jurist interviews law clerks, if the law clerk says, I'm a member of the bar, it affects your GS, pay scale. It affects whether you're going to accept someone as your judicial law clerk. It's a heavy position to get. This same law clerk, not one of yours who's watching from another jurist, has lied in his MCLE or her MCLE requirements to the state bar. Lied up and down. Got that certificate by lying, by concealing evidence of their criminal history, by a host of stuff that Lord knows the California bar was important to. And Lord knows it'd be important to you as a jurist interviewing a law clerk. But no one would say their false statements to the California bar involved a matter of the judiciary, involved the jurisdiction of the judiciary. Constantly a false statement under 1001. Even though downstream reliance, you're absolutely going to look at that. You're going to be concerned about that. It matters to you, but it's not actionable under the criminal law. We ask the court to reverse that amendment to the trial-based instruction letters. But we really ask to grant this judgment acquittal based on sufficiency. All right, counsel. Thank you very much for your arguments. U.S. v. Sajoku is submitted.
judges: Goodwin, Hawkins, Wardlaw